Filed 4/30/13  P. v. Romero CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D060887 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN288104) |
| WILLIAM ROMERO, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County,

K. Michael Kirkman, Judge.  Affirmed as modified.


A jury found William Romero guilty of second degree murder (count 1), gross

vehicular manslaughter (count 2), driving under the influence causing injury (count 4),

driving with a blood alcohol level of .08 or higher causing injury (count 5), and hit and

run with death or permanent serious injury (count 6).  On count 2, the jury also found

true the allegation that Romero fled the scene of the crime after committing the

offense, and on counts 4 and 5, the jury found true that Romero caused great bodily

injury to Oscar Lopez, Sr.  Romero appeals, contending (1) the evidence was

insufficient to support the malice element of second degree murder, and (2) his convictions on counts 4 and 5 must be reversed because those offenses are lesser included offenses of count 2. The Attorney General concedes and we agree that counts 4 and 5 are lesser included offenses of count 2. We modify the judgment to reverse the convictions on counts 4 and 5 and affirm in all other respects.

FACTUAL BACKGROUND

We limit our recitation to those facts that are pertinent to resolution of Romero's claims on appeal.

On Easter day in 2010, Romero went to a party at the home of his ex-wife, Christina Gold. When Romero arrived at Gold's home between 2:00 and 3:00 p.m., he was already intoxicated. Romero had tequila and some beer while at the party. He made a comment to Gold that if he drove, someone was going to die that night. After Romero became loud and belligerent, Gold told him to "crash on the couch." Romero vomited several times.

Romero's daughter, Victoria Shacreaw, left the party around 5:00 p.m. and returned two hours later. Romero was asleep while Shacreaw was gone. Around 7:30 p.m., Romero stated to Shacreaw, "If I drive right now either I'm gonna die or some innocent's gonna die." At 8:40 p.m., neighbors came to the house and said they were going to have Romero's car towed because it was in their driveway. Shacreaw asked Romero for his keys in order to move the car, but Romero pushed her and the neighbors out of the way and took off. As Romero was running down the stairs, Shacreaw told him to give her the keys because he was too drunk to drive.

2

Romero's son, Nicholas, was also at the party that day. Nicholas left the party in the afternoon and returned to the home that he shared with his father. Around 9:00 p.m. that night, Nicholas heard Romero's Camaro pull into the driveway. When Nicholas went outside to Romero's car, Romero was sitting in the driver's seat talking on the phone. Romero drove away around 10:00 p.m.

Shortly before midnight, Robert Houston was driving southbound on Interstate 5 near San Onofre when he looked in his rearview mirror and saw a sports car approaching him very fast. The sports car was traveling at approximately 100 miles per hour and recklessly changing lanes. Other witnesses also observed a dark Camaro traveling at a high rate of speed and recklessly moving across lanes of traffic. The Camaro then hit the rear end of a Ford Explorer, causing the Explorer to spin and hit the guardrail.

Lopez, Sr., and his son, Oscar Lopez, Jr., were thrown out of the Explorer. Lopez, Sr. died from his injuries and Lopez, Jr., who was found lying on the northbound side of the freeway, suffered a laceration on his head that required staples to repair. Two other passengers did not sustain any injuries requiring treatment.

When Officer Mark Keyes and his partner arrived at the site of the accident, they received information that the driver of the Camaro had fled the scene. The officers spotted Romero walking along a frontage road next to the freeway. Romero darted down a trail towards the beach. Border Patrol agents found Romero lying in the brush. Although agents did not mention the crash, Romero immediately stated that he was not the driver of the vehicle. He claimed the driver was a man named "Ted," who

3

he met at Lucky John's bar in Fullerton that night. Romero told officers that he was drinking beers with Ted at the bar and later, in a nearby park.

Romero's blood was drawn at a hospital. His DNA matched DNA from blood samples taken from the driver's side airbag in the Camaro and a metal guardrail. When Romero's blood was drawn at 2:05 a.m., his blood alcohol level was .10 percent. Jorge Pena, a criminalist with the San Diego County Sheriff's Crime Laboratory, testified that based on a normal rate of elimination, Romero's blood alcohol level at the time of the crash was between .125 and .145 percent. Pena explained that because of the "Mellanby effect," a person feels the effects of alcohol more during intake than during the time the body is eliminating alcohol from the system.

DISCUSSION

Romero argues there was insufficient evidence to support his second degree murder conviction. Specifically, he contends the record does not support a finding of implied malice because the facts show he waited six hours after his last drink before attempting to drive from Fullerton to San Diego. We reject this argument.

When a defendant challenges the sufficiency of the evidence to support his conviction, we examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence from which the jury could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 576, 578.) We must presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) Unless it is clearly shown that "on no hypothesis

4

whatever is there sufficient substantial evidence to support the verdict," we will not reverse. (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429.) If the circumstances, plus all the logical inferences the jury might have drawn from them, reasonably justify the jury's findings, our opinion that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1329.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (Pen. Code, § 187, subd. (a).) Malice is implied when the circumstances of the killing show "an abandoned and malignant heart." (Pen. Code, § 188.) Under *People v. Watson* (1981) 30 Cal.3d 290, 296–297, a homicide caused by a drunk driver may, under appropriate circumstances, be prosecuted as second degree murder. To support a second degree murder conviction based on implied malice, the defendant must have "deliberately performed an act, the natural consequences of which are dangerous to life, knowing that the conduct endangers the life of another, but acting with conscious disregard for that risk of life." (*People v. Autry* (1995) 37 Cal.App.4th 351, 358.) To establish the requisite implied malice, a subjective standard is applied; in other words, the defendant must have actually appreciated the risk involved. (*Ibid.*) However, " 'it is not necessary to establish that the defendant intended that his act would result in the death of a human being.' [Citation.]" (*People v. Swain* (1996) 12 Cal.4th 593, 603.) "The implied malice component of second degree murder may be described as a mental state encompassing these elements: knowledge that the act involves a high probability that death will

5

result; a specific intent to do the act despite such knowledge; a base, antisocial purpose with wanton disregard for human life." (*People v. Young* (1981) 120 Cal.App.3d 683, 692, italics omitted.)

Here, there was ample evidence that Romero harbored implied malice sufficient to support his second degree murder conviction. The evidence showed that Romero knew and appreciated the consequences and risks associated with driving while intoxicated. In the afternoon before the crash, Romero told Gold that someone would die if he drove that night. He made a similar comment to Shacreaw around 7:30 p.m. As late as 8:40 p.m., which was only two and a half hours before Romero alleges he started his drive from Fullerton to San Diego, Shacreaw told Romero that he was too drunk to drive.

Moreover, although Romero attempts to frame his argument to suggest that he made a conscious decision to wait until 11:15 p.m., six hours after his last drink, before driving, the evidence indicated that he was highly intoxicated, passed out or vomiting during most of that time. Further, Romero did not wait six hours before getting into a car. Despite his daughter's objections and statement that he was too drunk to drive, Romero pushed her aside and got into his vehicle around 8:40 p.m. when neighbors came to the house. Notably, Romero did not have to drive at that point. He had the option of allowing his daughter to move his car but refused her request for his car keys. According to Romero's son, Romero stopped at his house and drove again around 10:00 p.m. that night. Although Romero claims he did not drive until 11:15 p.m. and it is unclear what he did between 10:00 p.m. and the time of the

6

crash, that does not change the result. In our view, the evidence does not indicate Romero made a purposeful decision to wait until he was sober because of the risks associated with drinking and driving. To the contrary, he was aware of the risks and made the decision to drive regardless of those risks.

We are also not convinced that evidence of the "Mellanby effect" diminishes Romero's culpability, especially where there was clear evidence that he knew the consequences of his actions and engaged in dangerous conduct. In addition to Romero's statements acknowledging the risks of drinking and driving and his decision to drive despite those risks, Romero's conduct showed a wanton disregard for life. Multiple witnesses observed Romero driving at a speed of approximately 100 miles per hour and recklessly changing lanes. These factors support a finding of implied malice. (*People v. McCarnes* (1986) 179 Cal.App.3d 525, 535 ["*pattern* of reckless, high-speed passing maneuvers" supported finding of implied malice]; *People v. Albright* (1985) 173 Cal.App.3d 883, 887 [defendant guilty of second degree murder where he drove at 100 miles per hour knowing that other people were on the road and must have known the high probability that he would cause death if he continued his conduct].)

Lastly, without developing the argument, Romero claims that "[w]ithout legally adequate evidence, [his] convictions also violate [his] federal constitutional right to due process." Having found that substantial evidence supported Romero's conviction for second degree murder, we reject his federal due process claim.

7

DISPOSITION

The convictions on counts 4 and 5 are reversed.  In all other respects, the judgment is affirmed.  The trial court is directed to modify the abstract of judgment accordingly and forward a copy to the Department of Corrections and Rehabilitation.


McINTYRE, J.

WE CONCUR:

HUFFMAN, Acting P. J.

IRION, J.

8